Okay, last argument of the day will be docket number 25-1317, A.L.M. Holding Company v. Zydex Industries. Good afternoon, Your Honors, and may it please the Court, my name is Joseph Diedrich, I'm here for the plaintiffs' appellants A.L.M. and Ergun. Never before has this Court held that a patent owner lacks Article III standing. Plaintiffs here are the patent owners. This Court should hold they have Article III standing and it can reach that conclusion in one of two ways. First, the Court can hold that an exclusionary right is sufficient but not necessary and that plaintiffs have Article III standing because they suffered monetary harm, a quintessential injury in fact. Second, even if an exclusionary right is necessary, plaintiffs have standing. The Court in intellectual tech recognized the critical distinction between a patent owner and a licensee. A patent owner has an exclusionary right, excuse me, a patent owner has Article III standing unless they've transferred away all of their exclusionary rights. Here the plaintiffs have at least one and in fact several exclusionary rights and these rights reinforce each other to ensure that none is rendered illusory. What's the exclusionary right here? Well, there are several but let me start with the sub-license veto at Section 2.3 of the  If Ingevity, our licensee, proposes to us a sub-license, we can say no and thereby exclude a third party from practicing the patent. You can't be unreasonable in denying the sub-license, is that right? That is true but that doesn't mean it's not exclusionary and let me explain why. That just means that there is a class of unreasonable vetoes and a class of reasonable vetoes and in fact defendants at page 32 of their brief admit that there are some at least limited circumstances in which we can reasonably exercise the veto and at the end of the day because we are the patent owner, if we can exclude just one party for one reason from practicing the patent, that means we have an exclusionary right. What's your conception of what would be a reasonable veto of a sub-license? Well, I would start with this court's decision in Lone Star where you said that if for example the proposed, in that case it was an assignment, but subject to a reasonable veto provision, if the proposed assignment would be something that was not promised to be bound by the original agreement, that would be an example of a reasonable withholding of consent. Our agreement here with Ingevity in Section 2.3 includes a provision that requires all licensors to be bound by the terms of the agreement with Ingevity. But other examples come to mind as well. For example, if Ingevity had proposed a royalty-free sub-license that would moot a patent infringement lawsuit, that would be certainly an example where we would have the ability to reasonably veto that sub-license. This court considered similar reasonable veto language in PROPAT and in Lone Star. PROPAT was a sub-license case. Lone Star was in the assignment context. In both times, you said that language where the veto holder, that indicated that the veto holder retained substantial control. In Lone Star, was that the only right that was the basis for reaching a conclusion of constitutional standing? I thought it was really a collection of rights taken together. Well, so actually in Lone Star, where I'm pulling this substantial control language from, that was the part of Lone Star that was coming, that came after the Article 3 discussion. But I think it's still critical here because at page 29, note 5 of their brief, the defendants connect the concept of substantial control to whether or not a right here is exclusionary. And I'll just quote, the question of whether the veto power is a significant restriction is still relevant to the court's determination of whether to characterize the right as exclusionary. And again, both in Lone Star and in PROPAT, you said this kind of language, not to be unreasonably withheld, means the veto holder retains substantial control. The exact kind of language that my friend on the other side says is relevant to the But you're saying that was for statutory standing? That was for statutory standing, but my friend on the other side says it counts for exclusionary as well. We have a difficulty in our case law in trying to suss out distinctions between statutory standing and constitutional standing. And maybe there are times where we've borrowed some of the analysis in one context and said that it could be used in the other context. But it's not so clear when that is appropriate and when that is not appropriate. I mean, one standard is an exclusionary right. The other one is all substantial rights. Do you have anything to offer on how to parse out the distinctions, if any, between those two? Well, so I would say this. First of all, I agree with you that a lot of the past case law is difficult to understand. It does combine those concepts. And I think, Your Honor, as part of Lone Star, you recognize that we're trying to move in a different direction. I don't think this court has gotten all the way there yet, but I think intellectual tech makes clear that when it's a patent owner, at least an exclusionary right will do. What does exclusionary mean? What does all substantial rights mean? I would encourage you to go back to the fundamental grant of rights from the patent statute, which is a monopoly to exclude everybody. And then the all substantial rights analysis says, well, if we're going to break apart those rights at some point, how many of those rights have to be given away such that somebody else is the effective patent owner, meaning they have effectively everything? But nobody's made that argument in this case, so at least at this point, everybody's agreeing that we, the plaintiffs, have at least some rights under the patent statute remaining. Counsel, how does the lack of right to settle litigation impact the injury impact analysis here? Well, first of all, to the extent your question includes a premise that we lack the ability to settle, I would push back on that premise. Because our right to file litigation, first of all, it's primary and shared with Ingevity. It's not secondary to Ingevity. Second, it includes the right to proceed to judgment, including to obtain an injunction, which is a form of excluding somebody else. If we get to the point where we want to settle, we can certainly settle for an agreed amount of damages, and we can settle for an agreement not to continue practicing the patent. That we can do all without Ingevity's help. The one thing that we perhaps, at least, cannot do without Ingevity's help is enter into a forward-looking sublicense. But that doesn't mean we lack an exclusionary right. That just means we lack one form of settlement. Importantly, our enforcement rights, found in 5.1 and 5.2, are not illusory. This separates our case from the many district court cases that my friend on the other side cites, including Unilock at the district court, Deere, and United Access, precisely because Ingevity cannot grant a sublicense to the alleged infringer on a royalty-free basis because we have the sublicense veto and because all sublicenses are royalty-bearing. The question I have may have just been answered by your last few sentences, but let me just ask to be sure. At Appendix 12, the district court, as I'm sure you saw, did rely on this Deere case from the district court for the proposition that the ability to bring or participate in infringement litigation is not an exclusionary right that confers on plaintiff's constitutional standing. What is your response to that? Is Deere wrong or Deere is distinguishable because of the nature of the litigation right retained by the plaintiff? The easiest way to deal with Deere is to say that it's distinguished because, in that case, there was no veto authority over sublicenses or assignments, and that meant that the licensee could moot any patent owner-initiated infringement by granting a royalty-free sublicense. I think Deere, like some other cases, are probably also wrong. It bears a lot of resemblance to the Unilock district court decision, where this court affirmed but on collateral estoppel grounds, not on Article III standing grounds. The court went out of its way then in an intellectual tech to say that we don't endorse the Unilock district court's standing analysis and said, again, this court in Unilock, too, said there's considerable force to the argument that even if the licensee had been granted a license and unfettered right to sublicense, the patent owner would still have Article III standing. Here, the right to sublicense that Ingevity has is certainly not unfettered. All of those sublicenses are royalty-bearing, and we still have the reasonable veto. Somebody had asked me earlier about other circumstances where a veto might be reasonable. I just want to return to that briefly. Just to understand the patent here, it's a warm mix chemical that makes it easier to spread binder when you're laying asphalt. My clients are not in the specialty chemical business, so we licensed to Ingevity, which is in the specialty chemical business. We would not want a direct competitor of us, a road construction company or an asphalt company, to necessarily have the same access to this technology, and so that would be another circumstance where if Ingevity had proposed to license to a direct competitor of ours that we might reasonably exercise our veto power. Now, there might be disagreements about whether or not a particular exercise of the veto would is reasonable, but that's a dispute between us and Ingevity, and the fact that we even get to that question shows that the reasonableness language in the agreement has some force to it. Are there any other exclusionary rights you want to point us to in terms of the agreement beyond the sublicense veto right in Section 2? I would be happy to, Your Honor. So next, I'd move to Section 2.4, which is our sublicenses to affiliates. This Court has said on multiple occasions that the right to sublicense is an exclusionary right, including in Morrow and in Lone Star. I understand— So it's not limited to just R&D, is that right? It's limited to our affiliates for noncommercial purposes, but that does not mean that it is an exclusionary right. It might be a small exclusionary right, but it's still one. The fact that it's to a small class of people for a limited purpose does not change that analysis because even noncommercial practice can count as infringement. Moreover, the sublicenses that we grant under that provision are royalty-free, meaning we could—and we do it without Ingevity's involvement, meaning we could moot any suit that somebody else—or excuse me, that Ingevity brings against one of our affiliates. The last couple that I'll point you to, Your Honor, the royalty right, which I mentioned before, Lone Star at page 1234 listed Lone Star's right to collect royalties as among the reasons it had Article III standing. And finally, the same veto power exists over assignments of rights under 11.4. Did you mention the right to sue? We had discussed the enforcement right earlier, but I would certainly include that among our rights. Intellectual Tech cites the Alfred E. Mann case, which specifically points out the right to sue as an important right. Again, it's not illusory. What about Morrow? So I have a few specific reasons why that case is distinguishable and then more general reasons why that case is unpersuasive. As to why it's distinguishable, that was not a patent owner case. Again, there's a critical distinction between patent owners and licensees for purposes of Article III standing. Unlike here, that case involved a situation where the patent title was severed from the right to sue. Here, those two rights, important rights, continue to be joined. And unlike here, the plaintiff in Morrow had no right to royalties. More generally speaking, that was a split decision. It was not cited in Intellectual Tech while Alfred E. Mann was. And it was decided in that pre-Lexmark, pre-Lone Star era when this court did more freely commingle Are you saying we're not bound by Morrow? Well, I'm saying that, in fact, you might not be. So in Lone Star, let's assume we're bound by Morrow. Even assuming you're bound by Morrow, you're not going to overturn Morrow. So to be clear, when I say you're not bound by it, I don't mean you have to overturn it or go en banc. You can recognize that there are intervening Supreme Court decisions, which is exactly the move that you made in Lone Star when you said that prior decisions that mix the analysis are wrong because of the intervening Supreme Court precedent. Let me ask you along a similar line. In Blue Brief, page 27, footnote 4, you talk about that this court should apply the Article 3 standing law of the regional circuit, but then you also do a but-see site to a federal circuit case. So what I want you to just tell us is, are you contending here that really all we should be doing is applying regional circuit law and not even federal circuit law here? What do you contend is what we should do in terms of applicable law? Yeah, well, so our front line argument was in fact that an exclusionary right is always sufficient but never necessary to show Article 3 standing because monetary harm, the Supreme Court said, is the quintessential injury in fact. I do think that that would be the preferable route to go. And if you're going to go that route, then the regional circuit law is the law that should apply because Article 3 standing is something that is essential and unchanging. It's a constitutional standard. It shouldn't depend on what claim is being brought. But I understand that if you don't want to go in that direction, then you don't need to consider the regional circuit question because you're then continuing under your exclusionary rights precedent. But if you did want to go there, and just briefly, that would be more faithful to Supreme Court precedent. It would recognize the distinction between factual and legal injury, and it would announce an easily administrable rule for district courts to apply on an issue that at least recently has been confounding them. I understand that Judges Chan and Stark were on the RECOR panel recently where this very similar issue was considered. In Unilock, you had to reject the Article 3 standing analysis for a patent owner. In LoanStar, you had to reject that analysis, and we're asking you to reject that analysis here. For whatever reason, district courts appear to be getting this issue wrong and increasingly wrong. And if you were to take our cue and follow the monetary harm analysis, then what would happen is the injury in fact problem would go away. But that doesn't mean that you would suddenly have more people getting into court because there's still other elements of standing. And of course, you have your Section 281 analysis. I think you've used up all your time and then some. We'll see if we can give you some rebuttal. Appreciate that. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. I would like to begin where my friend began, which is a statement about what's being asked to be done for the first time. We disagree that this would be the first time that a patentee has ever been held not to have constitutional standing, but it would be the first time that this Court would hold that someone, a patentee, which had divested itself of any right to grant licenses or sub-licenses to unrelated third parties was held to have standing. It's never happened before. And as Judge Stark observed in a district court case from 2021, there has never been a case finding constitutional standing for a plaintiff that ultimately cannot settle a lawsuit filed in its name. And as my colleague said, there are circumstances where this case, the case that was brought under these licenses and against Sidex, could be settled, but not by granting a license, not by granting a sub-license. And when we think about the all-substantial rights distinction versus the exclusionary rights distinction that Your Honors were discussing with my colleague, that just seems anathema to the idea of exclusionary rights, which are you can prevent someone from practicing a patent, either a patented product or a method, or you can forgive that. When you think about all-substantial rights, other things, other non-exclusionary interests might come into play. What goes on in the Patent Office? What ultimately will be the back and forth between the Patent Office and those folks? License arrangement, the patent owner here does have the right to sue and therefore the right to forgive, in a sense, to forego filing an infringement action and thereby permitting someone to practice the technology without liability. Judge, I would say a couple of things. I think that the bare contractual right to sue Morrow holds is insufficient, and that makes good legal sense. You couldn't have constitutional standing because you've got a contract that says you've got constitutional standing. So the mere fact that you've got that ability, I don't think really bears on. The question is, was the right to sue in Morrow perhaps illusory because in that particular case, some co-trustee who was the patent owner had all the licensing rights? And here, at least under this contract, it appears that not only can the patent owner institute an infringement action, but it will be the one that collects any and all damage So I guess a couple of things, Your Honor. The patentee would not, in this litigation, be able to forgive the infringement by granting a sub-license. They're not able to exercise that act of forgiveness in this case. Right, but they could just allow the person to practice the invention, period, without suing them, without bothering them. Indeed, and that was the impression that was left here because as is set forth in the appendix at appendix 69, there is an outreach from the plaintiffs in this case to the defendants in 2017 at appendix 69, which is we think you may be violating these patents. But don't look at us. You're barking up the wrong tree. If you'd like to talk to us about a license, you've got to call Longevity in order to do that. Because they're the only ones who are going to be able to determine whether or not you're good to go or not when it comes to these patents. So I think that that really is a sort of a distinction there in terms of how that compares. There's just never been a situation where you've got someone who just is able to sub-license to their own corporate family. And in section 7.5 of this license agreement, which does not even exist anymore, but section 7.5 of that agreement says, and we guarantee the performance of those affiliates. So they're not even really outside the contract. We've just got a little world. And if we think about the patent, as Volpel tells us, as that bundle of sticks, we've got a patentee which is left with twigs, which is left with non-exclusionary twigs to be able to practice these patents only for non-commercial purposes, only for R&D. That's just not the hallmarks of someone who's got the rights to exclude under these patents. I heard the other side lead with the sub-license veto. Yes. So exclusionary right. Yes, Your Honor. So I don't believe, I heard from my colleague, and I don't believe in any of the briefs, there has ever been an instance where a sub-licensing veto has been held to be an exclusionary right. The unreasonably withheld language, the fact that the prior exposure and approval cannot be unreasonably withheld, I think that that's informed by a couple of different cases. We look first to Volpel, which says, albeit in a different context, in a pre-lexmark world, that this is a minor derogation. When you've got an unreasonably, not to be unreasonably withheld language. Said that? Volpel. Volpel in 1991 says that. Speed play that expands on that idea in 2000 and says, that's right as a general matter. And in particular, when we're looking at a veto within the context of patent licenses, we think about what does unreasonably withheld mean? If something is unreasonably withheld or something is, if you're going to reasonably withhold something, it's got to be because that action would undermine the consideration for entering into the agreement. In effect, it would undermine the purpose of the agreement. And the purpose of this agreement is a different sort of purpose than what we see in, at least in my experience, what we've seen in patent licenses, which says, we want people to be using more mixed asphalt, capitalized term, something that these patents are described as covering. And this is in the recitals of the 2008 license at Appendix 78. So we're looking for people to use this. It's a different sort of a license. Again, one that doesn't exist, but it's a different sort of a thing. If there, I believe my colleague said as well, if there was some issue about whether or not there had been a grant of a sublicense that was perhaps unreasonable or that there was a disagreement about that, that would be a contractual dispute between Ingevity and the plaintiffs. And that's exactly right. We agree with that. That's a contractual dispute to be sorted out, which would not divest Ingevity of its right to have provided that sublicense, to have granted it. I'm not sure I'm understanding the weight of this argument. At the end of the day, the plaintiff patent owner can tell Ingevity it's exclusive licensee. You cannot enter into a license with any particular third party so long as their exercise of that veto is reasonable, correct? So long as their exercise of that is reasonable, I think that's right. That sounds to me like they retain some significant right to exclude folks from practicing their patent for any reasonable reason they may have. I think there's a couple of things that I think would undermine that sort of view, Your Honor. And I think one of them is we look to what's actually happened with regard to this sublicensing, looked at what's occurred. Where do you get that principle that we look to? And I saw this argument in your briefs. If they haven't exercised a power, they somehow lose the ability to exercise that power in the future? No, no. They have lost that power because this license doesn't agree anymore. So we know the universe that existed and we know ultimately what happened. This license doesn't what? Doesn't exist anymore. Because you've been pointing out that the license doesn't exist anymore. What is the import of that for this case? Like, my understanding is maybe the fact that the agreement was amended, it might apply to related cases. But we still look at this agreement we've been talking about for our purposes, for our analysis for this case, right? Absolutely, Your Honor. I think that this is, and this differs, I think, from the ReCore case that Judge Stark and Judge Chin had heard because of the look back period. The reason we're talking about this. in this and in the related case. Correct. Absolutely right, Judge. So we are absolutely talking about the correct license agreement for purposes of this appeal. But this is not the operative agreement governing anything anymore. So we're talking about a license agreement which began and ended and which has sort of been relegated to the dustbin except for purposes of determining when the damages look back period would ultimately begin. But I guess what you were trying to argue, if I follow it, but I'm not understanding the merits of this argument, is because apparently ALM has never, or never did because it's over, never exercised its sub-license veto, that we should therefore treat that as not an exclusionary right even if we see it in the contract? It's not a lack of exercising, Judge. It's what do these other agreements say and what sort of ability do they give those folks to do? And let me give you some examples. So when we think about an assignment of this, which is governed by section 11.4 of the 2008 agreement, this agreement was assigned twice, automatically, not because of any failure to exercise a veto, just because it happened automatically. So you start with Midwest-Vaco. Midwest-Vaco merges with ROC-10. This is in appendix 24 and 25. It's set forth in the complaint. That forms a multi-billion dollar new company called Westrock. They then spin off a different company that becomes Ingenuity. All along the way, the license gets assigned automatically to those folks. So that's all happening. In addition, you then get grants of sub-licenses. Those sub-licenses include the same sort of language, that if those sub-licensees were to do the same sort of thing, merge, et cetera, things get passed on. So there is a theoretical possibility that the plaintiffs could, in certain circumstances, stop Ingenuity or stop others on a reasonable basis from doing things. But the actual text of how this agreement works, about what can occur about the sub-licensing rights that others hold, means that effectively that's just an illusory right. So it's not so much about exercising the right. Maybe to be more concrete, no pun intended, if there was a competitor in their business, as was described by your friend on the other side, that wanted to be sub-licensed by Ingenuity, and ALM didn't want that to happen, wouldn't that be a reasonable exercise of a non-illusory veto right? I don't think there's any evidence of anyone ever exercising or in case saying that that was a reasonable exercise. That certainly is not in the records here. Just go with his hypothetical. We understand the agreement is, in your statement, in the trash can. But just go with what Judge Stark presented to you. Would that be a reasonable exercise of a non-illusory right? I don't think in light of the purposes of the agreement, which says we want more people to be using and adopting warm mix asphalt as it's capitalized. At least implicitly they want more people to use it so that they'll get money for that. I think that's a separate thing. They both say that they would like to grow their business, and that's true. But there is no ability, Judge Stark, to obtain money directly from a sub-licensee on the part of the plaintiffs. They have the right to obtain money from Ingenuity, but that is separate. That obligation is separate from whatever terms Ingenuity may have. As I understand, they have some reasonable veto right over the terms of the sub-license that Ingenuity is granting, correct? They have the ability to, yes. They could exercise that right to say there needs to be some upstream financial benefit to us, either directly or indirectly at some point. That would be reasonable, would it not? I don't know that there's any basis in the agreement to do that. All the agreement says is that you provide the terms and conditions for prior approval. And if there's a disagreement on that, then the two parties sort that out. That just the ability to exclude somebody or the ability to forgive that just doesn't seem to flow from that. I'd like to talk just a moment, then, Your Honors, just with the little bit of remaining time here, about this question of royalties and the ability to obtain them. Because I think that that dovetails with what Your Honors were just talking about. Again, just like a sub-licensing veto has never been recognized to be an exclusionary right, so too, at least as far as I can tell, has royalties, has the ability to receive royalties ever been recognized as an exclusionary right? And my colleague cited Lone Star as saying, well, that's something where the court said you've got the ability to collect royalties. But in Lone Star, that sort of omits the context of when the court said that. So the reference that I believe my colleague was making was on page 1234 of Lone Star, where there's an offhanded reference to the transfer agreement reference in each complaint suggesting that Lone Star is allowed to, quote, collect royalties, end quote. But then the next sentence after that reads, those rights distinguish Lone Star from the plaintiff in Morrow, who lack the ability to grant licenses or forgive infringement. And that's the description that fits the plaintiffs here. They lack the ability to grant licenses or forgive infringement to anyone other than their affiliates for non-commercial purposes. That's not an exclusionary rights under Morrow or under any of the cases that followed thereafter. Do you contend there's a case saying that a sublicensed veto cannot be an exclusionary right? No. I don't think anyone, I don't think this court or any other court has held that it cannot be an exclusionary right. I think it does not have the hallmarks of an exclusionary right, particularly because of the unreasonably withheld language, as we view that through the lens of fall poll and speed play. Let me ask it this way. Judge? Do you think the irreducible constitutional minimum of suffering an injury in fact is something less than what is required to be all substantial rights that therefore effectively makes you deem the patent owner under the Patent Act? I think it's different. I don't think it's a question of greater than or less than. I just think it's viewing from a different lens, from the lens of ownership and hallmarks of ownership as opposed to. I don't think we've said it, but it does feel like statutory standing is something of a more demanding threshold than constitutional standing. And it sounds that way because it's all substantial rights as opposed to an exclusionary right, an versus all. It does sound that way. However, when it comes to the core and crux of a patent, and the right to exclude, the monopoly right that you have, that's what cuts to the core of exclusionary rights. And so I just think that they're viewed from a different lens and have to be viewed through that lens of what a patent really is about. That's what exclusionary rights gets to. And that's the core of why we think that the district court got this right. OK. Thank you very much. Thank you, Jim. All right. I'll give Mr. Diederich two minutes. Two minutes. Thank you, Your Honor. I'll start with the royalties and just respond to my friend's Lone Star discussion. At Lone Star at page 1235, the court said, Lone Star alleged that it possesses the sort of exclusionary rights that confer Article III standing. The transfer agreement, which is referenced in each complaint, also suggests as much. And that it quotes specific provisions of the transfer agreement. And one of them is what allows Lone Star to collect royalties. My friend on the other side cited valpal and speed play in relation to the unreasonably withheld language. Since valpal and since speed play, this court decided Pro Pat and Lone Star, which also considered very similar language to what we have in our agreement. And those cases essentially went the other direction in holding that the veto holder retained substantial control. That is what we have here. And I think that is indicative of an exclusionary right. And I heard my friend on the other side agree with us that there are at least some circumstances where the veto power can be reasonably exercised. And we can exclude or prevent a particular person for a particular reason from exercising or practicing the patents. And all we need is one exclusionary right. And I think that's certainly enough. Affirming the district court here would essentially mean that a patent owner who grants a standard exclusive license cannot sue for patent infringement. That novel rule would be as disruptive as it is wrong. The court should reverse. Thank you. Thank you. Cases submitted.